**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Unisource Worldwide, Inc., | No. CV-12-02036-PHX-NVW |
| Plaintiff, | **ORDER** |
| v. | |
| Troy Swope, et al., | |
| Defendants. | |

Before the Court are Defendants Chung, Newton, and Moore's Motion for Judgment on the Pleadings on Counts One, Two, Three, Eleven, and Twelve of the Second Amended Complaint ("Defendants' Motion") (Doc. 111), the Response, and the Reply.  Defendants' Motion will be granted in part and denied in part.

## I.    BACKGROUND

On September 25, 2012, Unisource Worldwide, Inc. ("Plaintiff"), a company involved in the marketing, selling, and distribution of packaging, paper, and facilities supplies products throughout the United States and in other countries, brought suit against Troy Swope, a former employee, alleging breach of contract and other transgressions.  Plaintiff's Second Amended Complaint (Doc. 64) added a number of additional defendants to the action, among them Defendants Yoke Chung, Cary Newton, Jr., and Brandon Moore.  All three are former employees of United Global Solutions ("UGS"), a single division of Unisource Worldwide, Inc. engaged in the design, sourcing, sale, and distribution of environmentally friendly packaging material. (Doc. 64 ¶¶ 31, 52,

66, 80.)   According to Plaintiff, Defendant Chung was the Director of Products and Material Engineering for UGS starting on February 21, 2010; he resigned on November 14, 2012.  (*Id.* ¶¶ 52, 133, 135.)  Defendant Newton was employed on November 3, 2010, as UGS' Manager of Business Development – Technical Packaging, making him responsible for managing customer relationships.   (*Id.* ¶¶ 66-67.)   UGS terminated Newton's employment on November 14, 2012.  (*Id.* ¶ 137.)  Finally, Defendant Moore began as a UGS Product Specialist II on October 4, 2009, and was, on August 15, 2011, promoted to the position of Creative Design Engineer II, making him the lead designer for customized packaging designed to fulfill particular customer needs.  (*Id.* ¶¶ 80-82.) He resigned from UGS on November 12, 2012.  (*Id.* ¶ 133-34.)

The allegations against Defendants Chung, Newton, and Moore are as follows: (1) breach of the non-competition covenant by Chung and Newton (Count 1); (2) breach of the non-solicitation of customers covenant by Chung and Newton (Count 2); (3) breach of the non-recruitment of employees covenant by Chung and Newton (Count 3); and, against all three Defendants, (4) breach of the return of property and information covenants (Count 4); (5) breach of the covenant of confidentiality (Count 5); (6) breach of the duty of loyalty and fiduciary duty (Count 7); (7) violation of the Arizona Trade Secrets Act, sections 44-401 to 44-407 of the Arizona Revised Statutes (Count 10); (8) tortious interference with contractual and business relations (Count 11); (9) civil conspiracy (Count 12); and (10) business defamation (Count 13).  Defendants Chung, Newton, and Moore now seek a judgment on the pleadings at to Counts One, Two, Three, Eleven, and Twelve.

## II.    LEGAL STANDARD FOR JUDGMENT ON THE PLEADINGS

A motion for judgment on the pleadings made pursuant to Federal Rule of Civil Procedure 12(c) is evaluated under the same standard as a Rule 12(b)(6) motion to dismiss.  *Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989).  On a motion to dismiss under Rule 12(b)(6), and therefore on a motion under Rule 12(c), all allegations of material fact are assumed to be true and construed in the light most

1   favorable to the non-moving party.  *See Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th

2   Cir. 2009).  However, the principle that a court accepts as true all of the allegations in a

3   complaint does not apply to legal conclusions or conclusory factual allegations.  *Ashcroft*

4   *v. Iqbal*, 556 U.S. 662, 678 (2009).  Judgment on the pleadings is appropriate when there

5   are no issues of material fact and when, as a result, the moving party is entitled to

6   judgment as a matter of law.  *Gen. Conference Corp. of Seventh-Day Adventists v.*

7   *Seventh-Day Adventist Congregational Church*, 887 F.2d 228, 230 (9th Cir. 1989).

8   **III.      CLAIMS POTENTIALLY FACING PREEMPTION**

9          Count Eleven alleges against all Defendants tortious interference with contractual

10   and business relations, and Count Twelve alleges against all Defendants a civil

11   conspiracy.  (Doc. 64 ¶¶ 212-28.)  Defendants contend that these counts are preempted by

12   the Arizona Uniform Trade Secrets Act ("AUTSA"), sections 44-401 through 44-407 of

13   the Arizona Revised Statutes, and accordingly seek dismissal.  Plaintiff asserts that the

14   conduct alleged in Counts Eleven and Twelve goes beyond the scope of claims

15   preempted by the ATSA; Plaintiff also seeks leave to amend if the claims in the two

16   counts remain unclear.

17          **A.   Factual Overview**

18          The factual allegations in Count Eleven include the following: (1) Defendants had

19   knowledge of Plaintiff's customer and employee relationships; (2) Defendants solicited

20   Plaintiff's customers to discontinue their business with Plaintiff and potentially to

21   purchase the products and services that they had previously gotten from Plaintiff from a

22   competitor; (3) Defendants sought to have Plaintiff's employees leave Plaintiff and work

23   for a competitor; and (4) Defendants induced one another to violate their restrictive

24   covenants and to disclose Plaintiff's confidential information and trade secrets.  (*Id.*

25   ¶¶ 213-21.)  For Count Twelve, Plaintiff alleges that Defendants, among other things,

26   conspired to delete, share, and/or misappropriate Plaintiff's confidential information and

27   trade secrets.  (*Id.* at ¶¶ 223-28.)  In both counts, Plaintiff also incorporates by reference

28   all preceding allegations in the Second Amended Complaint.  (*Id.* ¶¶ 212, 222.)  Finally,

Plaintiff separately alleges in Count Ten that Defendants' actions violated the AUTSA because Defendants acquired Plaintiff's trade secrets by improper means and used or disclosed those trade secrets without consent.  (*Id.* ¶¶ 206-11.)

### B.   Legal Background

The Arizona Uniform Trade Secrets Act ("AUTSA") codifies the common-law protection of trade secrets and lays out the relief available for misappropriation of a trade secret.  A.R.S. §§ 44-401 to 44-407.  Under the statute, a "trade secret" is information that: (1) derives independent economic value from being not widely known and not easily determinable; and (2) is the subject of reasonable efforts to maintain its secrecy.  *Id.* § 44-401(4).  In broad terms, "misappropriation" is the acquisition of a trade secret by someone who knows that improper means were used to obtain the information, or the disclosure or use of a trade secret without the consent of its owner under certain circumstances.  *Id.* § 44-401(2).  Further, the AUTSA contains a preemption clause: "[T]his chapter displaces conflicting tort, restitutionary and other laws of this state providing civil remedies for misappropriation of a trade secret."  *Id.* § 44-407.  Contractual remedies, regardless of whether they are rooted in a misappropriation claim, and civil remedies that are not based on misappropriation claims remain unaffected by the AUTSA.  *Id.*

### 1.   Preemption of Information other than Trade Secrets

Arizona state courts have not addressed the issue of whether the AUTSA only preempts claims based on misappropriation of information that meets the statutory definition of "trade secret" or whether claims based on misappropriation of information that falls short of that definition might likewise be preempted.  In the absence of guidance from the state high court, a federal court evaluates the issue using intermediate appellate court decisions, decisions from other jurisdictions, treatises, and other sources.  *Vestar Dev. II, LLC v. Gen. Dynamics Corp.*, 249 F.3d 958, 960 (9th Cir. 2001) (citation omitted).  A number of jurisdictions have identical preemption provisions in their trade-secrets statutes, as the statutes derive from the Uniform Trade Secrets Act ("UTSA").

Among courts in those jurisdictions, "[t]he majority interpretation appears to be that the UTSA preempts all common law tort claims based on misappropriation of information, whether or not it meets the statutory definition of a trade secret." *Firetrace USA, LLC v. Jesclard*, 800 F. Supp. 2d 1042, 1048 (D. Ariz. 2010); *see also Hauck Mfg. Co. v. Astec Indus., Inc.*, 375 F. Supp. 2d 649, 655 (E.D. Tenn. 2004) (noting that the preemption provision has "generally been interpreted to abolish all free-standing alternative causes of action for theft or misuse of confidential, proprietary, or otherwise secret information falling short of trade secret status").

Multiple justifications support the majority interpretation.  First, the purpose of the statutory scheme was to "create a uniform business environment [with] more certain standards for protection of commercially valuable information." *Firetrace*, 800 F. Supp. 2d at 1048 (quoting *Mortg. Specialists, Inc. v. Davey*, 153 N.H. 764, 775-76, 904 A.2d 652, 663 (2006)).  Preemption in particular furthers the goals of "uniformity and clarity that motivated the creation and passage" of an act addressing trade-secret protection.  *Id.* at 1049 (quoting *Auto Channel, Inc. v. Speedvision Network, LLC*, 144 F. Supp. 2d 784, 789 (W.D. Ky. 2001)).  If the AUTSA only preempted torts concerning misappropriation of bona fide trade secrets, then "[i]n every instance where a plaintiff could not meet the statutory requirements of the [AUTSA], the court would be forced to re-analyze the claim under the various common law theories." *Auto Channel*, 144 F. Supp. 2d at 789.  The effort to imbue the contours of trade-secret protection with some certainty would be undermined if the AUTSA preemption clause only applied when actual trade secrets, and not information falling short of that standard, were involved.  *Firetrace*, 800 F. Supp. 2d at 1048.

In addition, to the extent that a secondary objective of preemption is to promote efficiency and conserve judicial and party resources, that objective is undermined if the court must consider the often complex question of whether information constitutes a trade secret before addressing preemption.  Accordingly, it must be the case that the AUTSA preempts torts based on misappropriation of information regardless of whether it qualifies

as a trade secret.

### 2.    Preemption of Claims Premised on Acts Beyond Misappropriation

The AUTSA expressly preempts all common-law tort claims for misappropriation of a trade secret.  A.R.S. §44-407.  It does not affect "[o]ther civil remedies that are not based on misappropriation of a trade secret."  *Id.*  The exact implications of that statutory provision, however, remain unsettled.  *See Hauck*, 375 F. Supp. 2d at 655-58 (discussing at length the current state of jurisprudence on the extent of preemption).  Some courts have approached preemption as a cannonball that dooms all state tort claims that relate in whole or in part to misappropriation.  *See, e.g.*, *Thomas & Betts Corp. v. Panduit Corp.*, 108 F. Supp. 2d 968, 972-76 (N.D. Ill. 2000) (ruling that claims ranging from breach of fiduciary duty and conversion to fraud and tortious interference with confidentiality agreement were preempted by the Illinois Trade Secrets Act).  Other courts treat preemption as a weapon of greater precision, taking out only those target torts that echo exactly the facts underlying misappropriation.  *See, e.g.*, *Callaway Golf Co. v. Dunlop Slazenger Grp. Americas, Inc.*, 318 F. Supp. 2d 216, 220 (D. Del. 2004) (noting that preemption depends on whether claim "merely restates the operative facts that plainly and exclusively spell out only trade secrets misappropriation") (internal quotation marks and citations omitted).  At present, "in order for [common-law tort] claims to survive they must rely on something more than allegations of misappropriation of trade secrets," but "what exactly that 'something more' must be" is a matter yet unsettled.  *Hauck*, 375 F. Supp. 2d at 656 (citing cases adopting different standards for what beyond allegations of misappropriation a claim needs to survive preemption).

Even this Court has been less than consistent in adopting a rule as to the breadth of AUTSA preemption.  One approach has been to espouse a narrow form of preemption and hold that an allegation of *any* act beyond what constitutes misappropriation allows the tort claim to survive preemption.  In other words, a tort is not preempted unless it mimics misappropriation exactly—unless it involves no act beyond that of misappropriation itself.  *See, e.g.*, *W.L. Gore & Assocs. v. GI Dynamics, Inc.*, 872 F.

- 6 -

1    Supp. 2d 883, 895 (D. Ariz. 2012) (ruling that, "[t]o the extent that the [tort claims]

2    allege acts other than misappropriation of a trade secret, they are not preempted").  A

3    second, broader view of preemption holds that any tort that builds on or is rooted in

4    misappropriation is preempted.  Pursuant to that view, a "claim will be preempted when it

5    necessarily  rises  or  falls  based  on  whether  the  defendant  is  found  to  have

6    'misappropriated' a 'trade secret'."  *Hauck*, 375 F. Supp. 2d at 658.  In *Food Services of*

7    *America Incorporated v. Carrington*, this Court adopted the second, broader view in

8    holding that a claim of a scheme to defraud was based on the alleged misappropriation of

9    confidential information and that the claim was therefore preempted, even though it

10   included allegations beyond pure misappropriation.  No. CV-12-175-PHX-GMS, 2013

11   WL 424507, at *2 (D. Ariz. Feb. 4, 2013).[1]

12        In  adopting  a  legal  rule  regarding  preemption,  two  considerations  beyond  the

13   language of the statute are paramount.  First, the selected rule should not generate the

14   uncertainty and lack of uniformity that the passage of the AUTSA was designed to

15   eliminate or limit in the first place.  Second, the rule should not facilitate duplicative

16   recoveries for the same underlying injury.  *See Hauck*, 375 F. Supp. 2d at 658.

17        Taking  those  two  considerations  and  the  text  of  the  AUTSA  into  account,  the

18   second, broader theory of preemption prevails.  First, the language of the AUTSA

19   supports the broader of the two approaches.  Under the statute, the preemption provision

20   does not affect "[o]ther civil remedies that are not based on misappropriation of a trade

21   _____

22   [1] As a practical matter, the two rules—and other rules espoused by different courts—may
     produce the same outcome.  For example, in *Cosmetic Alchemy, LLC v. R & G, LLC*, the

23   Court  ruled  that  "to  the  extent  that  the  counterclaim  allege[d]  that  the  intentional
     interference of business expectancy [was] based on acts, other than the misappropriation

24   of trade secrets, that induc[ed] or otherwise caus[ed] a third person not to enter into or
     continue a business relationship" with the party bringing the tort claim, the claim was not

25   preempted.  No. CV-10-1222-PHX-GMS, 2010 WL 4777553, at *3 (D. Ariz. Nov. 17,
     2010) (internal quotation marks and citation omitted).  In that case, the Court appeared to

26   embrace the narrow, "any act beyond misappropriation suffices" rule.  However, the
     broader rule can produce the same result, as the act of contacting a business' customers

27   and distributors and causing them to discontinue working with the business, if done by
     improper means, can potentially be actionable even if no alleged misappropriation is

28   involved.  *See Miller v. Hehlen*, 209 Ariz. 462, 471, 104 P.3d 193, 202 (Ct. App. 2005).
     The claim does not necessarily rise or fall with the claim of misappropriation of trade
     secrets.

secret." A.R.S. § 44-407(B). The inverse has also been taken as true: "The AUTSA preempts common law claims 'to the extent they are based on an allegation that [d]efendants misappropriated trade secrets.'" *W.L. Gore*, 872 F. Supp. 2d at 895 (quoting *Firetrace*, 800 F. Supp. 2d at 1047). Logic suggests that a claim is "based on" misappropriation when that misappropriation underlies the claim—when misappropriation is a building block of the claim. The broader take on preemption accordingly preempts any claim that necessarily rises or falls with misappropriation: Any claim that is based on, or rooted in, or inescapably relies on, misappropriation is preempted. The narrower, "any act beyond misappropriation" rule would allow many claims to survive, contravening the language of the statute, simply because they have at least one act in addition to misappropriation of a trade secret, even though the claims are still "based on" that misappropriation. For example, under the narrow view a civil conspiracy to misappropriate trade secrets would evade preemption solely because the conspiracy involves the act of agreement beyond that of misappropriation. How a civil conspiracy to misappropriate a trade secret is not based on misappropriation, though, is unclear. Accordingly, the language of the AUTSA supports the broader preemption as adopted in *Food Services*.

Second, the broader conception of preemption does more than its narrow counterpart to both further uniformity and reduce the possibility of duplicative recoveries. Reducing the range of common-law claims that a plaintiff can bring has both of these effects. The plaintiff is less able to "dress up" the same nucleus of facts in different guises that could easily allow for different recoveries across jurisdictions, and is less likely to recover more than once for the same actual injury.

Even though the possibility of duplicative recoveries is reduced, broad preemption does not leave a plaintiff with a valid claim of harm without the possibility of remedy. The AUTSA allows for damages for actual losses and unjust enrichment attributable to misappropriation of a trade secret. A.R.S. § 44-403(A). If a plaintiff has common-law claims that are preempted by the AUTSA, and the plaintiff then proves a violation of the

AUTSA, it can recover for all of the damages caused by the underlying misappropriation. As such, the plaintiff can ultimately recover under the statute for the harm caused by the effects of the AUTSA violation—whether in theory they derived from the intentional interference with a business expectancy, tortious interference with contracts, or other common-law tortious acts.  If, for example, a civil-conspiracy-to-misappropriate claim is preempted by the AUTSA and the plaintiff can establish that AUTSA violation, then the plaintiff can potentially recover for any harm caused by the civil conspiracy over and above the baseline harm due to misappropriation itself.  Injunctive relief is also available, if appropriate.  *Id.* § 44-402(A).  If instead the plaintiff cannot establish the AUTSA violation because no provable misappropriation occurred, then the plaintiff would also not have been able to prove any claims based on that misappropriation; plaintiff has lost nothing when those claims are preempted.  If the plaintiff cannot make its case under the AUTSA because the information in question is not a trade secret, then once again preemption is not a problem.  When information does not rise to the level of a trade secret, then the plaintiff has no property interest in the information upon which to premise a claim of or based upon misappropriation.  *See Hauck*, 375 F. Supp. 2d at 657 (noting that if the plaintiff's claim does not involve a trade secret, "the plaintiff has no legal interest upon which to base his or her claim," rendering the claim not cognizable); *Powell Prods., Inc. v. Marks*, 948 F. Supp. 1469, 1475 (D. Colo. 1996) ("If the design of the plaintiff's machine is not a trade secret, plaintiff has no property right in its design, and it therefore would have no claim.  Alternatively, if the design is a trade secret, plaintiff's claim is preempted by the UTSA.").  Thus, extending preemption to such claims causes no harm.

For these reasons, AUTSA preemption is relatively broad and extends to any claim that rises or falls with misappropriation of a trade secret.  Alternatively put, "if proof of a non-[A]UTSA claim would also simultaneously establish a claim for misappropriation of trade secrets, it is preempted irrespective of whatever surplus elements or proof were necessary to establish it."  *Hauck*, 375 F. Supp. 2d at 658; *see*

1  *also Food Servs.*, 2013 WL 424507, at *2; *Smithfield Ham & Prods. Co., Inc. v. Portion*

2  *Pac, Inc.*, 905 F. Supp. 346, 350 (E.D. Va. 1995) ("The question is . . . whether failure of

3  the misappropriation claim would doom the remaining counts as well.").

4       **C.   Analysis of Preemption**

5          **1.   Preemption of misappropriation claims**

6       First, to the extent that the claims in Counts Eleven and Twelve amount only to

7  misappropriation of trade secrets, they are preempted.  A.R.S. § 44-407.  Preemption

8  applies whether the misappropriation is of trade secrets or of information that does not

9  meet the definition of trade secret, and so the issue of whether the allegedly

10  misappropriated information constitutes a trade secret need not be decided.

11          **2.   Interference with customer relationships**

12       The first claim in Count Eleven derives from the following allegations:

13            213. Unisource has existing and prospective relationships

14            with numerous customers and with its employees.

          214. Defendants had knowledge of these existing customer

15            and employee relationships.

16            215. Upon information and belief, Defendants have interfered

17            and continue to interfere with Unisource's relationships with
          its existing customers by soliciting those customers to

18            discontinue their business with Unisource and/or to purchase
          from a competitor of Unisource the same products or services

19            that they previously purchased or are currently purchasing
          from Unisource.

20  (Doc. 64 ¶¶ 213-15.)

21       First, although this is not necessary for preemption, customer lists may qualify

22  under Arizona law as trade secrets.  *See Inter–Tel (Del.), Inc. v. Fulton Commc'ns Tel.*

23  *Co., Inc.,* No. CIV 07-866 PHX RCB, 2007 WL 1725349, at *6 (D. Ariz. June 12, 2007)

24  (stating that under Arizona law, "'[a] list of customers, if their trade and patronage have

25  been secured by years of business effort and advertising and the expenditure of time and

26  money' has been held to 'constitute[] an important part of a business' that merits

27  protection as a trade secret") (quoting *Prudential Ins. Co. v. Pochiro,* 153 Ariz. 368, 371,

28  736 P.2d 1180, 1183 (Ct. App. 1987)); *Calisi v. Unified Fin. Servs., LLC*, 232 Ariz. 103,

302 P.3d 628, 631-33 (Ct. App. 2013) (describing considerations relevant under Arizona law for determining whether a customer list is a trade secret).   Second, the AUTSA defines "misappropriation" as either:

> (a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means [or]
>
> (b) Disclosure or use of a trade secret of another without express or implied consent by a person who either:
>
> > (i) Used improper means to acquire knowledge of the trade secret[;]
> >
> > (ii) At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use[; or]
> >
> > (iii) Before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

A.R.S. § 44-401(2).   To the extent that Plaintiff is arguing that Defendants used confidential information, customer lists or names, without consent to interfere with Plaintiff's customer relationships, the claim is one of misappropriation and is preempted. The allegations are unclear, but if Plaintiff is instead making a claim of tortious interference with customer relations by improper means to complement its related claims, including breach of the covenant not to solicit Plaintiff's customers, the claim is not preempted.

### 3.   Recruitment of Plaintiff's employees

The crux of Plaintiff's second claim in Count Eleven is that:

> 216.   In addition, Defendants have interfered and continues [sic] to interfere with Unisource's relationships with its employees by soliciting those employees to terminate their employment with Unisource and obtain employment with a competitor.

(Doc. 64 ¶ 216.)  Plaintiff's tortious interference claim regarding employee relationships is preempted to the extent that Plaintiff is contending that the names of employees are confidential and that Defendants used such information improperly.  If Plaintiff is arguing instead that Defendants tortiously interfered by improper means with Plaintiff's contracts with other employees, *see Miller v. Hehlen*, 209 Ariz. 462, 471, 104 P.3d 193, 202 (Ct. App. 2005), the claim is not preempted.  This strain of improper tortious interference has nothing to do with the use (or misuse) of confidential information; the claim is not based on one of misappropriation.

### 4.   Violation of existing contractual relationships

Plaintiff's allegations continue as follows:

> 217.   Unisource also has existing contractual relationships with Swope, Chung, Newton, and Moore whereby Swope, Chung, and Newton are obligated to refrain from competing against Unisource and soliciting its customers and Swope, Chung, Newton, and Moore are obligated to refrain from using or disclosing Unisource's trade secrets and other confidential and/or proprietary information.

(*Id.* ¶ 217.)  This allegation appears to be a summary restatement of the claims based on the restrictive covenants laid out in Counts One, Two, and Three.  Those claims are not preempted by the AUSTA.  To the extent that Plaintiff is seeking to state a non-contractual claim that any Defendant "used or disclosed" Plaintiff's trade secrets or other confidential information, the claim is flatly one of misappropriation and is preempted.

### 5.   Inducement to violate Defendants' contracts

Plaintiff also asserts that:

> 219.   Defendants have interfered and continue to interfere with Unisource's contractual relationships with Swope, Chung, Newton, and/or Moore by inducing Swope, Chung, and/or Newton to compete against Unisource, by inducing Swope, Chung and/or Newton to solicit Unisource's customers, and by inducing Swope, Chung, Newton, and/or Moore [] to disclose Unisource's trade secrets and other confidential and/or proprietary information in violation of their contractual obligations to Unisource.

(*Id.* ¶ 219.)  First, the allegation mingles different theories of harm and fails to make clear

- 12 -

exactly which Defendant allegedly engaged in what conduct.  Second, the claim of inducement "to disclose Unisource's trade secrets and other confidential and/or proprietary information" in violation of a confidentiality covenant is based on misappropriation of trade secrets.  Establishing such inducement would necessarily establish misappropriation.  Accordingly, the claim of inducement to violate a confidentiality covenant or inducement to otherwise use or disclose Plaintiff's trade secrets or confidential information is preempted.  *See Hauck*, 375 F. Supp. 2d at 659 (holding preempted a claim of interference that relied upon the breach of a confidentiality agreement).  The claims of inducement to violate contractual obligations not to compete with Plaintiff and not to solicit Plaintiff's customers are not based upon misappropriation and are not preempted.

Plaintiff will have an opportunity to amend its complaint to unfurl what appear to be different allegations against each Defendant in this Count and thereby to comply with pleading standards.  As discussed, any claim based on misappropriation, including the misuse by Defendants of customer lists or names, the misuse by Defendants of confidential employee information, and the use or disclosure by Defendants of trade secrets or other confidential information, is preempted and may not appear in the amended complaint.  Other claims, including tortious interference by improper means with customer or employee relations and inducement to violate contractual obligations, may be clearly alleged in the amended complaint.

### 6.   Civil Conspiracy

Count Twelve alleges a civil conspiracy in which "Defendants conspired by concerted action to delete, share, and/or misappropriate Unisource's confidential information and trade secrets."  (Doc. 64 ¶ 224.)  That claim is entirely based on misappropriation of trade secrets; the civil conspiracy count rises or falls with the misappropriation count.  As such, the claim is preempted in its entirety.  *See Hauck*, 375 F. Supp. 2d at 660 (holding that claim of civil conspiracy in which "overriding object . . . was to disseminate Plaintiff's confidential and proprietary information" was preempted,

1   as with "all general tort claims for theft of secret information"); *see also Rotec Indus.,*

2   *Inc. v. Mitsubishi Corp.*, 179 F. Supp. 2d 885, 892 n.2 (C.D. Ill. 2002) (ruling that UTSA-

3   based trade-secrets statute preempted conspiracy claim based upon misappropriation of

4   trade secrets).

5   **IV.     CLAIMS BASED ON RESTRICTIVE COVENANTS**

6           Defendants each signed several restrictive covenants as part of their employment

7   contracts with Plaintiff.   In Count One, Plaintiff alleges that Defendants Chung and

8   Newton breached their covenants not to compete ("Non-Competition Covenant").   In

9   Count Two, Plaintiff alleges that Defendants Chung and Newton breached their

10  covenants not to solicit Plaintiff's customers ("Non-Solicitation Covenant").   Finally, in

11  Count Three, Plaintiff alleges that Defendants Chung and Newton breached their

12  covenants  not  to  recruit  Plaintiff's  employees  ("Non-Recruitment  Covenant").

13  Defendants contend that the three restrictive covenants allegedly breached are facially

14  unreasonable and accordingly that they should be deemed unenforceable.  (Doc. 111 at

15  2.)  If such a judgment cannot be made solely upon the pleadings, Defendants request an

16  evidentiary hearing as to the reasonableness of the restrictive covenants.  Plaintiff, in

17  turn, asserts first that the reasonableness of each covenant is a fact-intensive inquiry that

18  cannot  be  decided  on  a  motion  under  Rule  12(c)  and  second  that  the  challenged

19  covenants are indeed reasonable.

20          **A.   Factual Overview**

21          Defendant Chung signed a Non-Competition Covenant that reads as follows:

22                  Employee agrees that during employment with the Company,
                    and  for  a  period  of  12  months  following  the  cessation  of
23                  employment  for  any  reason,  Employee  will  not  compete,
                    directly  or  indirectly,  with  the  Business  of  Unisource  by
24                  performing activities of the type performed by Employee for
                    the  Company  within  one  year  prior  to  Employee's
25                  termination  of  employment.   This  paragraph  restricts
                    competition  only  within  the  counties  in  which  Employee
26                  solicited business on behalf of the Company during the 12
                    months preceding the cessation of Employee's employment
27                  with the Company.

28  (Doc. 64-1 at 9.)   Defendant Newton signed an identical Non-Competition Covenant,

- 14 -

except that it also provides purposes for the covenant.  (*Id.* at 13.)  "Company" is defined as "Unisource Worldwide, Inc., and its subsidiaries, parents, affiliated entities, and includes the successors and assigns of Unisource or any such related entities."  (*Id.* at 8.)  The "Business of Unisource," in turn, is "selling, distributing or otherwise providing printing and specialty papers, packaging supplies and equipment, and industrial and commercial maintenance supplies and equipment."  (*Id.*)[2]

Defendant Chung's Non-Solicitation Covenant specifies that:

> Employee agrees that during employment with the Company and for a period of 12 months following the cessation of employment for any reason, Employee will not directly or indirectly solicit or attempt to solicit any business in competition with the Business of Unisource from any of the Company's customers or suppliers with whom Employee had Material Contact during the last year of Employee's employment with the Company.

(*Id.* at 8-9.)  Defendant Newton's Non-Solicitation Covenant is somewhat broader, also precluding Newton from doing business with or attempting to do business with any Company customer or supplier with whom he had material contact during his final year of employment with Company.  (*Id.* at 13.)  In this context, "material contact" means "personal contact or the supervision of the efforts of those who have direct personal contact with a supplier or customer."  (*Id.* at 8, 12.)

The third restrictive covenant in dispute, the Non-Recruitment Covenant, speaks to the recruitment of Plaintiff's employees, and provides:

> Employee agrees that during employment with the Company, and for a period of 12 months following the cessation of employment for any reason, Employee will not directly or indirectly solicit or attempt to solicit any employee of the Company with whom Employee had Material Contact during the last year of the Employee's employment, for the purpose of encouraging, enticing, or causing said employee to terminate employment with the Company.

---

[2] In Defendant Newton's contract, the terms are defined slightly differently, as follows. "Company" means "Unisource Worldwide, Inc., and its subsidiaries and includes the successors and assigns of Unisource or any of its subsidiaries."  (Doc. 64-1 at 12.) "Business of Unisource" means "selling, distributing, or otherwise providing printing and specialty papers; packaging products, supplies and equipment; and/or industrial and commercial maintenance products, supplies and equipment."  (*Id.*)

1  (*Id.* at 9.)   Here, "material contact" includes "personal contact with other Unisource

2  employees or the supervision of the work of other employees through subordinate

3  managers in the chain of command." (*Id.* at 8, 12.)   The operative provisions of

4  Defendants Chung's and Newton's Non-Recruitment Covenants are identical.

5      **B.  Legal Standard**

6        Arizona law does not look kindly upon restrictive covenants.  *See Valley Med.*

7  *Specialists v. Farber*, 194 Ariz. 363, 367, 982 P.2d 1277, 1281 (1999).   While the

8  common-law principles invalidating all restrictive covenants no longer control, the law

9  continues to disfavor such impositions on employees.  *See Amex Distrib. Co., Inc. v.*

10  *Mascari*, 150 Ariz. 510, 514, 724 P.2d 596, 600 (Ct. App. 1986).   Of the various forms of

11  restrictive covenants, those that "tend to prevent an employee from pursuing a similar

12  vocation after termination of employment" are particularly disfavored.  *Id.*   In part

13  because an employee is in a position of unequal bargaining power vis-à-vis his employer,

14  such restrictive covenants are strictly construed against the employer.  *Id.*

15        A restrictive covenant cannot simply squash fair competition by the former

16  employee.  *Farber*, 194 Ariz. at 367, 982 P.2d at 1281 (citing *Bryceland v. Northey*, 160

17  Ariz. 213, 216, 772 P.2d 36, 39 (Ct. App. 1989)).   Stated differently, a covenant not to

18  compete "is invalid unless it protects some legitimate interest beyond the employer's

19  desire to protect itself from competition." *Id.* (citing *Amex Distrib.*, 150 Ariz. at 518, 724

20  P.2d at 604).   Legitimate interests may include protecting for some time certain types of

21  information acquired by the employee during the course of employment and retaining the

22  customer base.  *Id.* at 367, 370, 982 P.2d at 1281, 1284.   Conversely, a covenant cannot

23  be used to preclude a former employee from using at a new job the skills he developed

24  while working for the employer.  *Bryceland*, 160 Ariz. at 217, 772 P.2d at 40.

25        A restraint that goes too far is unenforceable, and the validity of a restrictive

26  covenant hinges on its reasonableness.  *Olliver/Pilcher Ins., Inc. v. Daniels*, 148 Ariz.

27  530, 532, 715 P.2d 1218, 1220 (1986).  A covenant is reasonable and will be enforceable

28  only if: (1) the restraint is no greater than is necessary to protect the employer's

1  legitimate interest; and (2) that interest is not in contravention of public policy or

2  outweighed by the burden on the employee.  *Lessner Dental Labs., Inc. v. Kidney,* 16

3  Ariz. App. 159, 161, 492 P.2d 39, 41 (1971)).   To that end, to be enforceable, the

4  covenant must be reasonable with respect to its duration, its geographic scope, and the

5  range of employee's activities affected.  *See Farber*, 194 Ariz. at 370-71, 982 P.2d at

6  1284-85.   Further, any restraint on an employee's activities "must be limited to the

7  particular speciality of the present employment."  *Id.* at 371, 982 P.2d at 1285.   The

8  burden is on the employer to prove the extent of its protectable interests.  *See Compass*

9  *Bank v. Hartley*, 430 F. Supp. 2d 973, 979 (D. Ariz. 2006); *Bryceland*, 160 Ariz. at 216,

10  772 P.2d at 39.

11         Reasonableness, ultimately, is an issue of law.  *Farber*, 194 Ariz. at 366-67, 982

12  P.2d at 1280-81.   Generally, underpinning that issue of law is "a fact-intensive inquiry

13  that depends on weighing the totality of the circumstances."  *Id.*   That the inquiry is

14  usually fact-based does not, however, automatically preclude the possibility of a covenant

15  being unreasonable on its face.  *See generally Heartland Sec. Corp v. Gerstenblatt*, No.

16  99 CIV 3694 WHP, 99 CIV 3858 WHP, 2000 WL 303274, at *5-9 (S.D.N.Y. Mar. 22,

17  2000) (holding restrictive covenants unreasonable and thus unenforceable on a motion to

18  dismiss).

19         Finally, when a covenant is deemed unreasonable, a court may "blue pencil" the

20  covenant—strike out grammatically severable, unreasonable provisions—in order to save

21  the covenant, if the contract so directs.  *Farber*, 194 Ariz. at 372, 982 P.2d at 1286.

22  However, the court need not and cannot rewrite the covenant or its provisions in order to

23  render it enforceable.  *Id.*

24         **C.     Analysis**

25                **1.     Non-Solicitation and Non-Recruitment Covenants**

26         The language of the Non-Solicitation and Non-Recruitment Covenants does

27  appear to be both expansive and vague.   Ambiguity and excessive breadth in such

28  covenants are especially disfavored because of their *in terrorem* effect on employees,

who have little sense of which provisions of a particular covenant will in fact be enforceable and who therefore cannot determine what conduct is precluded.  *See id.*  For example, the text of the Non-Solicitation Covenant references "Material Contact" and precludes the former employee from soliciting business from a customer or supplier with whom he had "Material Contact."  (Doc. 64-1 at 8-9.)  However, "Material Contact" is not defined as "direct contact," and an employee may be banned from soliciting business from a customer or supplier with whom he never had direct contact; he may not even realize that the customer or supplier interacted with Unisource.  That the language is easily amenable to such a broad reading does justify concern.

Still, reasonableness is generally fact-focused inquiry, and the pleadings do not provide sufficient factual basis for a ruling that the Non-Solicitation and Non-Recruitment Covenants are unreasonable.  Plaintiff's Second Amended Complaint offers the language of the two covenants, a high-level overview of each Defendant's position and duties for Plaintiff, and a summary of Plaintiff's business activities (*see* Doc. 64); Defendants' Answers offer little more in the way of facts.  (*See* Docs. 91, 92, 93).  As a result, numerous questions that bear on the enforceability of the two covenants remain unaddressed.  Which business entities constitute "the Company?"  With which suppliers and customers did each Defendant have "Material Contact?"  With which other employees did each Defendant have "Material Contact?"  Absent answers to these questions, the reasonableness of the covenants cannot be determined.  Moreover, the proffered facts must be taken in the light most favorable to Plaintiff, and Plaintiff's contention that the covenants are enforceable is bolstered by the fact that covenants contain durational limits.   Accordingly, the Non-Solicitation and Non-Recruitment Covenants cannot be declared facially invalid.  Defendants' motion will be denied as to Counts Two and Three.  Further, because a ruling under Rule 12(c) must be made on the pleadings, the request for an evidentiary hearing to supplement Defendants' Motion will be denied.

1              **2.     Non-Competition Covenant**

2           Plaintiff's Non-Competition covenant, however, is unreasonable on its face.  First,

3      only "[r]easonable restraints—those no broader than the employer's legitimately

4      protectable interests—will be enforced."  *Amex Distrib.*, 150 Ariz. at 515, 724 P.2d at

5      601.    Here, Defendants Chung and Newton signed, among other provisions: (1)

6      Plaintiff's Duty of Confidentiality, precluding the disclosure of training, trade secrets,

7      and other confidential information; (2) Plaintiff's Assignment of Work Product and

8      Inventions, assigning to Plaintiff the exclusive ownership of all inventions and the like,

9      "whether or not the foregoing inventions or information are . . . prepared in the course of

10     employment;" (3) Plaintiff's Non-Solicitation Covenant; and (4) Plaintiff's Non-

11     Recruitment Covenant.  (Doc. 64-1 at 8-14.)  Each of these covenants appears to protect a

12     separate and legitimate employer interest.   Together, these covenants protect all of

13     Plaintiff's conceivably legitimate interests.

14          The Non-Competition Covenant then serves no purpose, save stifling fair

15     competition and crippling Defendants' ability to obtain employment elsewhere.  Neither

16     thwarting competition nor hamstringing a former employee's ability to work is a

17     legitimate interest.  *See Farber*, 194 Ariz. at 367, 982 P.2d at 1281; *Bryceland*, 160 Ariz.

18     at 217, 772 P.2d at 40.  Defendants cannot share with competitors or make use of

19     Plaintiff's confidential information or the inventions assigned to Plaintiff.  They cannot

20     siphon off Plaintiff's customers or other employees.   Even if working at Plaintiff's

21     competitor, all Defendants can do is use the skills they acquired while working for

22     Plaintiff at their new jobs.  Plaintiff has no legal right to stop them from doing so.

23          Plaintiff has the burden of establishing its protectable interests, *see Bryceland*, 160

24     Ariz. at 216, 772 P.2d at 39, and it has failed to proffer any such interest justifying its

25     Non-Competition Covenant.  In fact, Defendant Newton's Non-Competition Covenant

26     notes that its purpose is "to preserve the Company's customer relationships and to further

27     protect the Company's Confidential Information and Trade Secrets," (Doc. 64-1 at 13),

28     but both of these purposes have already been achieved by other covenants.  Having

1    carved out and secured each protectable interest with a separate covenant, Plaintiff cannot

2    then demand that Defendants abide by an "umbrella covenant" that functions only to

3    undermine fair competition and hurt Defendants' ability to work.

4          In addition, beyond the fact that the Non-Competition Covenant protects no

5    legitimate interest, its scope and vagueness render it unreasonable.  While the duration of

6    the provision, twelve months, may be reasonable, its geographical scope is not.

7    Defendant Chung's Non-Competition Covenant prevents him from from doing certain

8    activities "only within the counties in which Employee solicited business on behalf of the

9    Company during the 12 months preceding the cessation of Employee's employment with

10   the Company."  (Doc. 64-1 at 9.)  Defendant Newton's covenant applies in any county in

11   which he "solicited or did business" for Plaintiff in the final year before his termination.

12   (*Id.* at 13.)  First, Defendants are expected to have kept track of each Arizona county in

13   which they solicited or did business over the course of a year in order to attempt to

14   comply.  Moreover, Maricopa County alone, where Defendants reside and where they

15   worked for Plaintiff, (*see* Doc. 64 ¶¶ 12, 17-19), is 9,224 square miles.  Matthew

16   Mckinney et al., *Regionalism in the West: An Inventory & Assessment*, 23 Pub. Land &

17   Res. L. Rev. 101, 166 (2002).  Requiring Defendants to work in another county

18   effectively, and unreasonably, necessitates relocation.

19         Compounding the geographic concern is the fact that Plaintiff's contract provides

20   no clarity as to what it means to "compete, directly or indirectly, with the Business of

21   Unisource by performing activities of the type performed by Employee for the Company

22   within one year prior to Employee's termination of employment."  (*See* Doc. 64-1 at 2-5.)

23   The wide-ranging restriction not only precludes Defendants from doing such work for

24   competitors, but from doing such work anywhere within the restraint's geographic reach.

25   Thus, if Defendant Chung worked to design any product during his last year with

26   Plaintiff, or interacted with any supplier, or even answered phones, the language of the

27   provision now precludes him from doing the same or any activity of that type at *any* new

28   employer within certain counties for one year.  This is unreasonable.  The Non-

1    Competition Covenant is accordingly unreasonable both as to its geographic scope and
2    the range of activities prohibited.

3         Finally, the Non-Competition Covenant cannot be saved by the blue-pencil rule.
4    While courts may sever provisions of a covenant when doing so makes grammatical
5    sense, *Farber*, 194 Ariz. at 372, 982 P.2d at 1286, no acceptable alterations to the Non-
6    Competition Covenant would narrow its scope and thereby render it reasonable.[3]  *See,*
7    *e.g.*, *Olliver/Pilcher*, 148 Ariz. at 533, 715 P.2d at 1221.  Accordingly, Plaintiff's Non-
8    Competition Covenant is unreasonable on its face, and Defendants' Motion will be
9    granted as to Count One.

10       **IT IS THEREFORE ORDERED** denying Defendants Chung, Newton, and
11

---

12   [3] The blue-pencil rule cannot be applied in this case to save Plaintiff's Non-Competition
13   Covenant.  It is important to note, however, that even a rule permitting only limited
     editing by courts can allow the *in terrorem* effect of restrictive covenants, an effect of
14   great concern to the Arizona Supreme Court, to persist.  The Arizona Supreme Court
     acknowledged that "[e]mployers may . . . create ominous covenants, knowing that if the
15   words are challenged, courts will modify the agreement to make it enforceable." *Valley*
16   *Med. Specialists v. Farber*, 194 Ariz. 363, 372, 982 P.2d 1277, 1286 (1999).  The same is
     true even with the blue-pencil rule.  In fact, the blue-pencil rule incentivizes employers to
17   structure far-reaching and patently unreasonable non-compete covenants in a way that
     allows for courts to eliminate severable clauses, should a former employee choose to bear
18   the burden of litigation.  *See Kolani v. Gluska*, 64 Cal. App. 4th 402, 408 (1998) (ruling
19   that narrowing an overly broad covenant would be contrary to public policy and noting
     that "[e]mployers could insert broad, facially illegal covenants not to compete in their
20   employment contracts.  Many, perhaps most, employees would honor these clauses
21   without consulting counsel or challenging the clause in court, thus directly undermining
     the statutory policy favoring competition.  Employers would have no disincentive to use
22   the broad, illegal clauses if permitted to retreat to a narrow, lawful construction in the
23   event of litigation."); *Richard P. Rita Pers. Servs. Int'l, Inc. v. Kot*, 229 Ga. 314, 317, 191
     S.E.2d 79, 81 (1972), citing Harlan M. Blake, *Employee Agreements Not to Compete*, 73
24   Harv. L. Rev. 625, 682-83 (1960) ("'For every covenant that finds its way to court, there
25   are thousands which exercise an in terrorem effect on employees who respect their
     contractual obligations and on competitors who fear legal complications if they employ a
26   covenantor . . . .  If severance is generally applied, employers can fashion truly ominous
27   covenants with confidence that they will be pared down and enforced when the facts of a
     particular case are not unreasonable. This smacks of having one's employee's cake, and
28   eating it too.'").

Moore's Motion for Judgment on the Pleadings (Doc. 111) with respect to Counts Two and Three.

**IT IS FURTHER ORDERED** granting Defendants' Motion with respect to Counts One and Twelve.

**IT IS FURTHER ORDERED** granting in part and denying in part Defendants' Motion with respect to Count Eleven, as explained in the text of this Order.

**IT IS FURTHER ORDERED** permitting Plaintiff to file a third amended complaint on or before August 26, 2013.  Plaintiff is to amend Count Eleven to remove the preempted claims as discussed in this Order and to clarify the remaining claims, in separate counts if appropriate, in conformity with the pleading standards under the Federal Rules of Civil Procedure.  Defendants will then have an opportunity to file an amended answer or responsive pleading.

Dated this 8th day of August, 2013.

_____
Neil V. Wake
United States District Judge